ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL IV

| | | |
|---|---|---|
| SUSAN KAY WILKERSON TILLEY<br><br>Apelante<br><br>v.<br><br>ESJ RESORT, LLC Y OTROS<br><br>Apelado | KLAN202300822 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de Carolina<br><br>Caso Número: CA2021CV00671<br><br>Sobre: Despido injustificado (Ley Núm. 80 y Otros) |

Panel integrado por su presidenta, la Jueza Cintrón Cintrón, la Jueza Rivera Marchand y el Juez Rodríguez Flores

Rivera Marchand, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a ___ de noviembre de 2023.

Comparece ante nos, Susan Kay Wilkerson-Tilley (Wilkerson-Tilley o apelante) y solicita que revoquemos la *Sentencia* emitida por el Tribunal de Primera Instancia, Sala de (TPI o foro primario) el 7 de septiembre de 2023 y notificada el 8 de septiembre de 2023. Mediante dicho dictamen, el foro primario declaró ha lugar la *Moción de Sentencia Sumaria* presentada por ESJ Resort, LLC (ESJ o apelado) y ordenó la desestimación de la demanda de epígrafe.

Por los fundamentos que exponemos a continuación, revocamos en parte el dictamen apelado.

**I.**

El 18 de marzo de 2023, Wilkerson-Tilley incoó la querella[1] de epígrafe contra su antiguo patrono, ESJ, sobre despido injustificado, al amparo de la Ley Núm. 80 de 30 de mayo de 1976 (Ley 80), Ley Sobre Despidos Injustificados enmendada, 29 LPRA sec. 185a *et seq* y sobre discrimen por razón de edad e impedimento, al amparo de la Ley Núm. 100 de 30 de junio de 1959 (Ley 100), la Ley General contra el Discrimen en el Empleo en Puerto Rico, 29 LPRA sec. 146

---

[1] Apéndice, págs. 28-39.

Número Identificador

SEN2023_____

*et seq.* Interpuso su reclamación por la vía sumaria según autoriza la Ley Núm. 2 de 17 de octubre de 1961 (Ley 2), Ley de Procedimiento Sumario de Reclamaciones Laborales, 32 LPRA sec. 3113 *et seq*.

Entre sus alegaciones expuso que, laboraba para Williams Hospitality Group en el Hotel Condado Plaza desde julio del 1986 en el puesto de *Food and Beverage Outlet Manager* y que luego fue transferida al hotel El San Juan en el 1989, producto de la compra y remodelación del hotel. Allí se desempeñó como *Food and Beverage Manager* hasta el 2002, cuando ascendió al puesto de *Front Office Manager* adscrito al *Room Division* del hotel ESJ. Mientras ocupaba dicho puesto, el 24 de julio de 2019, ESJ despidió a Wilkerson-Tilley. Sostuvo que, según lo informado por la Directora de Recursos Humanos, la Sra. Kerania Olmo-Díaz (Sra. Olmo) se había eliminado la plaza de *Front Office Manager* por motivo de una reorganización de la empresa. A la fecha de su despido, alegadamente injustificado y discriminatorio, tenía cincuenta y siete (57) años. Además, alegó que ESJ incumplió el orden de retención al autorizar su despido sin justa causa y sin respetar su prelación por antigüedad en la empresa. A ello añadió que, la parte apelada la discriminó por su edad, así como por su incapacidad causado por un accidente ocurrido en el hotel en la que sufrió una fractura en su hombro derecho. Por ello, suplicó al foro primario se le indemnizara al palio de la Ley 80, *supra*, y Ley 100, *supra*, con el salario y los beneficios dejados de percibir, y resarcimiento por los daños sufridos, así como costas, gastos y honorarios de abogado.

En respuesta ESJ, mediante su alegación responsiva,[2] negó las aseveraciones atinentes a las causales del despido y acciones discriminatorias. Sostuvo que, la apelante fue amonestada en varias ocasiones por su pobre ejecutoria y su despido no respondió a ninguna represalia o razón injustificada. Destacó que, el despido

---

[2] Apéndice, págs. 40-67.

respondió a la eliminación del puesto, así como otras medidas de negocio adicionales que, formaron parte de un proceso de reestructuración o reorganización, cuyo propósito fue lograr economías necesarias para el hotel, particularmente después del paso del Huracán María por la isla. Por otro lado, expuso que el reclamo de Wilkerson-Tilley basado en incapacidad, no procedían y debían desestimarse de plano. Finalmente, negó la procedencia de las súplicas de la demandante y solicitó al foro primario que desestimara con perjuicio la querella instada.

Superadas las etapas iniciales del litigio y múltiples incidencias que resultan innecesarias pormenorizar, ESJ presentó una *Moción de Sentencia Sumaria*[3] en la cual propuso 54 hechos incontrovertidos y el derecho aplicable en aras de procurar la desestimación de la demanda instada en su contra. Para sostener su postura, anejó copia de deposiciones, copia de correos electrónicos y declaraciones juradas, entre otros documentos. En esencia, consignó que el despido de Wilkerson-Tilley fue parte de un plan de reorganización *bona fide*, conforme autoriza el caso del Tribunal Supremo, *Segarra Rivera v. Int'l. Shipping et. al.,* 208 DPR 964 (2022). Añadió que, su acción fue provocada por el déficit operacional multimillonario que ESJ arrastró por dos años, por lo que estaban eximidos de pagar una mesada, según dispone la Ley 80, *supra.* Además, arguyó que Wilkerson-Tilley nunca fue víctima de discrimen en su trabajo, por lo que las causas de acción presentadas ameritaban la desestimación con perjuicio de la

---

[3] Apéndice, págs. 102-443. Junto a la *Moción de Sentencia Sumaria*, ESJ presentó los siguientes documentos como anejos: (1) Deposición de Susan Kay Wilkerson-Tilley; (2) Deposición de la Sra. Kerania Olmo Díaz; (3) Deposición del Sr. Andro Nodarse León; (6) Estado financiero al 31 de diciembre de 2017; (7) Estado financiero al 31 de diciembre de 2018; (8) Estado financiero al 31 de diciembre de 2019; (9) Correos electrónicos del 18 de julio de 2019; (10) Tabla identificada como "Forecast Changes"; (11) Tabla identificada como "Contingency Plan-Reorganization 2019" o "Summary Operating Statement"; y (12) Tabla identificada "The San Juan Focus Template" en la cual se detallan los puestos a eliminarse, los que estaban en "hold" y los que recomendaban eliminar. Posteriormente, junto a un *Escrito Informativo Para Presentar Anejos Adicionales* incluyó el Anejo 4 que corresponde a la Declaración Jurada suscrita por Andro Nodarse León y Anejo 5 que corresponde a la Declaración Jurada suscrita por Kerania Olmo.

querella. En la alternativa, alegó que la apelante no logró establecer los elementos necesarios para un caso de discrimen y despido injustificado al no presentar testimonios y/o evidencia concreta de los alegados actos de discrimen, en cualquier modalidad.

En reacción, la apelante instó una *Oposición a Moción de Sentencia Sumaria*[4] mediante la cual aceptó 13 de los hechos propuestos por ESJ.[5] Asimismo, objetó los hechos propuestos números 5-8, 10-24, 26-37, 39-40, 44-47, 50-51 y 53. A su entender, existen cuatro controversias que impiden la adjudicación de la reclamación por la vía sumaria, a saber:

1. Si la querellante fue despedida por justa causa a tenor con la Ley Núm. 80 de 30 de mayo de 1976, según enmendada.
2. Si hubo un proceso de reorganización donde no se cumplió con el requisito de antigüedad según dispone la ley 80.
3. Si en el presente caso coinciden los elementos para una causa de acción de discrimen por razón de edad al amparo de la Ley Núm. 100 de 30 de junio de 1959, según enmendada.
4. Si hubo discrimen por incapacidad.

A ello añadió 24 propuestas de hechos incontrovertidos[6] que, a su entender, fundamentan su postura sobre la falta de un plan de reorganización *bona fide* y que su despido injustificado fue a su vez, discriminatorio. Arguyó que, en el 2019 se creó el puesto de *Guest Relations Manager* por el Sr. Martin Smith (Sr. Smith), Gerente General de ESJ, en el cual nombraron a la Sra. Ivonne Ramos (Sra. Ramos) quien era la *Concierge Manager* y se reportaba a Wilkerson-Tilley. Esto, quitándole funciones a Wilkerson-Tilley, sin alegadamente informarle sobre lo que ocurría. Con ello, alega que diariamente el Sr. Smith y la Sra. Ramos se reunían a puerta cerrada y conversaban sobre las áreas del Departamento

---

[4] Apéndice, págs. 444-513. Junto a la *Oposición a Moción de Sentencia Sumaria*, Wilkerson-Tilley presentó los siguientes documentos como anejos: (1) Declaración jurada suscrita por Susan Wilkerson-Tilley y (2) Carta del 10 de mayo de 2022 suscrita por el Lcdo. Christian O. Cintrón Pérez.
[5] Los hechos aceptados por Wilkerson-Tilley fueron los siguientes: 1-4, 9, 25, 38, 41-43, 48-49, 52 y 53.
[6] Apéndice pág. 496-501.

correspondientes a Wilkerson-Tilley y que cuando lograban reunirse los tres no le permitían expresarse. De otra parte, detalló como sufrió de una caída por la aparente negligencia de ESJ. En específico, expuso que, en el 2018, personal del hotel se encontraba pintando paredes y maderas, por lo que apagaron los aires porque el piso se mojaba y resbalaba. Wilkerson-Tilley acudió al baño y resbaló, lastimándose el hombro. Tres meses luego, le encontraron una fractura en el hombro, la cual requería una operación que se realizaría en agosto 2018. Alegó que, como consecuencia de la fractura, fue despedida injustificadamente un mes antes de la operación. Finalmente, suplicó al TPI que denegara el petitorio sumario interpuesto por entender que persisten controversias medulares.

Así las cosas, ESJ replicó y planteó, entre otras cosas, que la apelante en su oposición a la sentencia sumaria se basó en una declaración jurada que incorpora manifestaciones realizadas por ésta, las cuales no controvierten lo expresado en su deposición y resultan contradictorias. Igualmente, aseguró que, dicha declaración jurada se trata de un *sham affidavit* que debía ser excluida al consistir en una práctica que ha sido catalogada como indeseable por el Tribunal Supremo. Además, alegó que los hechos en controversia propuestos por Wilkerson-Tilley se presentaron fuera de tiempo, por lo que el TPI debía tomarlas por no puestas y dar por admitidas las propuestas por ESJ.

Luego de evaluadas la comparecencia de las partes y sus respectivos anejos, el 8 de septiembre de 2023[7], el TPI consignó los siguientes hechos incontrovertidos:

1. En el año 2015 un grupo de inversionistas, que incluía al Sr. Andro Nodarse, adquirió el Hotel San Juan.
2. Después de su adquisición, el grupo de inversionistas decidió hacer una renovación millonaria del Hotel San Juan.

---

[7] Apéndice págs. 79-80. Cabe señalar que surge del Informe de Conferencia con Antelación al Juicio, 21 hechos estipulados por las partes.

3. En el año 2016 hasta febrero de 2017 el Hotel San Juan estuvo cerrado por una extensa y millonaria renovación donde se demolieron habitaciones, se renovó la fachada, áreas de entretenimiento.

4. En septiembre del año 2017 Puerto Rico recibe los embates corridos de los huracanes Irma y María, lo que provocó daños catastróficos a través de toda la isla.

5. Entre otros efectos, esto provocó un déficit operacional del Hotel, para el año 2017, de $47,419,745.00.

6. Sin poder recuperarse de la pérdida de inversión y el azote de los huracanes el déficit operacional impactó de igual manera el año 2018, dejando un déficit de $39,753,679.00.

7. Para el año 2019 se proyectaba el mismo panorama financiero, que terminó en un déficit de $18,750,683.00.

8. Los años 2017 al 2019 representaron pérdidas multimillonarias al hotel San Juan, lo que atentaba contra su viabilidad empresarial.

9. En julio de 2019 el ESJ comenzó a evaluar opciones de reestructuración empresarial por problemas de mercado, económico y retos administrativos.

10. El Sr. Andro Nodarse describe la situación en el año 2019 como uno crítico, el hotel destruido totalmente, el fondo de inversiones multimillonaria acabado, al punto que se pensó que el hotel no sobreviviría.

11. El equipo que hizo esta evaluación estaba compuesto por personal gerencial de Coral Tree, compañía que administraba el Hotel, y el Sr. Andro Nodarse, uno de los dueños del Hotel.

12. El equipo se intercambió varios correos electrónicos con versiones alternas del plan de reestructuración y ahorro, que incluía la eliminación de ciertos puestos de trabajo, incluyendo el de Susan Wilkerson.

13. El 18 de julio de 2019 el equipo gerencial de Coral Tree, representado por Luersen Tom, notifica un correo electrónico al Sr. Andro Nodarse donde notifica lo siguiente:

    Gents,
    Please see the progress being made on the plan including some reductions in workforce, expense savings and some revenue generation.
    Martin has also sought legal review of severance which I pasted below as well. I would like to suggest we use tomorrow´s call time to review this plan. If so, I would like to invite Martine and Michael to join us.
    Please let me know your thoughts; the goal for tomorrow is to get your approval to proceed with the full plan (some has already been incorporated and initiated) Pls be sure to scroll down further on the email for more detail on the plan.
    Thanks

14. El correo electrónico del 18 de julio de 2019 tenía tres tablas de Excel anejadas. Una identificada como "Forecast Changes", una segunda identificada como "Contingency Plan-Reorganization 2019" y una última identificada como "El San Juan Focus Template".

15. El Forecast Changes proyecta un déficit operacional de -$8,152,715.00 para el año 2019.

16. El San Juan Focus Template contemplaba ahorros en los siguientes renglones: ahorros en bebida, aumento en precios de comida, cambios y extensiones de horarios para mejorar ingresos, reducción en equipos de renta, revisión de horario de barras, limitar ofrecimiento en bufet, cambio de horario de operaciones de barra principal, restricciones a impresora de color, eliminar uso

de botellas de agua, eliminar uso de platos desechables, ahorros en electricidad, cambios operacionales, cambio de horarios, cambios al webpage, entre otros.

17. El Contingency Plan o Plan de restructuración contemplaba la eliminación de las siguientes plazas:
    a. Susan Wilkerson. Front Office Manager.
    b. José Rodríguez. Cana Sous Chef.
    c. F and B Managers. To be identified.
    d. Manisha Lopez. FB Promotions and Event Manager.
    e. Eduardo Grau. Assistant Director FB.
    f. Jeisy Rodríguez. Pool Manager.
    g. Luis Feliz Correa. BT Sales Manager.
    h. Jose Ocaña. Director of Engineering.
    i. Marisela Mercedes Reyes. A/R Group. No. 10.

18. El Contingency Plan o Plan de Restructuración también contemplaba "possition on hold/open" las siguientes:
    a. Executive Chef
    b. Wedding Planner Manager
    c. ASST FB Manager
    d. Cana Sous Chef. No

19. El Contingency Plan o Plan de Reestructuración también contemplaba "recomendations positions to be eliminated", entre estas:
    a. IT Technician b.
    b. Reth Palmer. Director of IT c.
    c. María Quiñones. Clerk Accounting.

20. Los ahorros proyectados en salarios por el plan de restructuración se estimaron en: $900,879.60.

21. La Sra. Kerania Olmo, jefa de recursos humanos del Hotel, participó de varias fases del plan de reorganización, incluyendo su redacción.

22. El Sr. Andro Nodarse es uno de los dueños del ESJ y participó activamente en las conversaciones y confección del plan de reestructuración.

23. El Sr. Andro Nodarse consintió a la eliminación de varios puestos de trabajo, incluyendo al de Susan Wilkerson.

24. Según testificó Andro Nodarse, la eliminación de la plaza de Susan Wilkerson se tenía que hacer para salvar al hotel.

25. El Sr. Andro Nodarse es uno de los dueños del Hotel San Juan.

26. Según el testimonio el Sr. Nodarse, la decisión de hacer el plan de restructuración, y eliminar los puestos, se hizo porque era necesario hacer una reestructuración significativa para salvar al hotel.

27. Se eliminaron plazas intermedias que resultaban redundantes y no eran necesarias en ese momento histórico.

28. El Hotel había perdido decenas de millones de dólares y había requerido de múltiples inyecciones de capital, pero el lado operacional todavía necesitaba restructuración.

29. El capital que tenía el hotel se había diluido por todas las crisis recientes por las cuales pasó el hotel, entre ellas, los procesos de renovación, los huracanes y los retos económicos que representó esa época.

30. Para los años 2017, 2018 y 2019 el Hotel estaba operando con un déficit presupuestario según demuestran sus estados financieros.

31. En el año 2017 las pérdidas fueron de $47,419,745.00.20. En el año 2018 las pérdidas fueron de $39,753,679.00.

32. En el año 2019 en particular las pérdidas fueron de $18,570,683.00.

33. El plan incluyó un sin número de cosas donde se vieron posibilidades de reducir horas, eliminar ciertas posiciones donde había redundancia y buscar cómo

operar basado en el nivel de negocio que se tenía en ese momento.

34. El puesto de Susan Wilkerson se eliminó por la redundancia que generaba una posición intermedia de administración y por los ahorros que representaba esa eliminación.

35. La eliminación de puestos de trabajo o capas de equipo se hizo consciente de que se podía continuar ejecutando las funciones necesarias del contexto del negocio.

36. Los trabajos de Susan Wilkerson fueron absorbidos por su entonces supervisor, y distribuidor entre el personal.

37. Susan Wilkerson comenzó a trabajar en el ESJ en el 1989.

38. A Susan Wilkerson se le notificó la eliminación de su puesto el 24 de julio de 2019.

39. Al momento de la eliminación del puesto de Susan Wilkerson ella tenía el título de Front Office Manager, que es un puesto de supervisión intermedio.

40. El Director of Rooms era el director de la división a donde pertenecía el Front Office Manager, ese puesto lo ocupaba en el 2019 el Sr. Iván Osorio.

41. Iván Osorio era el supervisor de Susan Wilkerson.

42. Yvonne Ramos fue nombrada en febrero de 2019 como Director of Guest Relations.

43. El Director of Guest Relations se encarga de ser un punto de contacto con problema de los huéspedes recurrentes. Este puesto es una posición junior, con salario inferior, responsabilidades distintas, no de supervisión. Esta posición se reportaba directamente a Director of Rooms.

44. Susan Wilkerson no se encontraba en la misma clasificación ocupacional, ni tenía las mismas funciones y forma de hacer el trabajo que Yvonne Ramos.

45. En el despido de Susan Wilkerson no medió capricho o arbitrariedad, fue un ejercicio bona fide de reestructuración del ESJ.

46. La querellante alega que fue víctima de discrimen por edad.

47. La querellante admite que ella tenía 57 años de edad al momento de su despido.

48. Los supervisores de la querellante, Martin Smith e Iván Osorio, eran mayores de cincuenta (50) años.

49. La compañera de trabajo Yvonne Ramos, tenía unos cuarenta y siete (47) años.

50. La querellante admitió que en los años que trabajó en el Hotel, nunca presentó una queja o querella por discrimen en el trabajo.

51. La querellante admitió que nunca se le mencionó la palabra "edad" o se le dijo "vieja".

52. La querellante presentó en su demanda alegaciones de discrimen por incapacidad.

53. La querellante admitió que no tiene incapacidad alguna.

Basado en lo anterior, el TPI emitió el dictamen recurrido mediante el cual declaró ha lugar el petitorio sumario interpuesto por ESJ y ordenó la desestimación de la demanda con perjuicio.[8]

Inconforme, la apelante acude ante esta Curia el 18 de septiembre de 2023 y señala que el TPI cometió los siguientes errores:

---

[8] Apéndice, págs. 1-27.

El Honorable Tribunal de Primera Instancia erró cuando determinó, sumariamente y sin mayor evaluación, que la apelante fue despedida de forma justificada sin considerar todas las controversias de hechos que hay planteadas en esta querella.

El Honorable Tribunal de Primera Instancia erró cuando determinó, sumariamente y sin mayor evaluación, que la apelante fue despedida de forma justificada sin considerar clasificación ocupacional y antigüedad.

En cumplimiento con nuestra *Resolución,* notificada el 21 de septiembre de 2023, ESJ presenta su alegato en oposición.

Con el beneficio de la comparecencia de ambas partes, procedemos a resolver.

**II.**

**A. Sentencia Sumaria**

El mecanismo de sentencia sumaria provisto en la Regla 36 de Procedimiento Civil de 2009, 32 LPRA Ap. V, R.36, permite a los tribunales disponer, parcial o totalmente, de litigios civiles en aquellas situaciones en las cuales no exista controversia material de hecho que requiera ventilarse en un juicio plenario, y el derecho así lo permita. *Serrano Picón v. Multinational Life Insurance Company,* 2023 TSPR 118, resuelto el 29 de septiembre de 2023; *Oriental Bank v. Caballero García,* 2023 TSPR 103, resuelto el 23 de agosto de 2023; *González Meléndez v. Municipio Autónomo de San Juan y otros,* 2023 TSPR 95, resuelto el 24 de julio de 2023; *Acevedo Arocho y otros v. Departamento de Hacienda de Puerto Rico y otros,* 2023 TSPR 80, resuelto el 26 de junio de 2023. Este mecanismo lo puede utilizar la parte reclamante o aquella parte que se defiende de una reclamación. 32 LPRA Ap. V, R. 36.1 y 36.2.

Mediante el mecanismo de sentencia sumaria, se procura profundizar en las alegaciones para verificar si, en efecto, los hechos ameritan dilucidarse en un juicio. *León Torres v. Rivera Lebrón,* 204 DPR 20, 42 (2020). Este cauce sumario resulta beneficioso tanto para el tribunal, como para las partes en un pleito, pues se agiliza

el proceso judicial, mientras simultáneamente se provee a los litigantes un mecanismo procesal encaminado a alcanzar un remedio justo, rápido y económico. *Universal Insurance Company y otro v. Estado Libre Asociado de Puerto Rico y otros,* 2023 TSPR 24, resuelto el 7 de marzo de 2023. Como se sabe, procede dictar sentencia sumaria si se desprende de las alegaciones, deposiciones, declaraciones juradas, contestaciones a interrogatorios, admisiones ofrecidas, entre otros, que no existe controversia real sustancial sobre un hecho esencial y pertinente, y siempre que el derecho aplicable así lo justifique. *González Meléndez v. Municipio Autónomo de San Juan y otros,* supra. De manera que, en aras de prevalecer en una reclamación, la parte promovente debe presentar prueba incontrovertible sobre todos los elementos indispensables de su causa de acción. *Universal Insurance Company y otro v. Estado Libre Asociado de Puerto Rico y otros,* supra.

Nuestro ordenamiento civil y su jurisprudencia interpretativa impone unos requisitos de forma con los cuales hay que cumplir al momento de presentar una solicitud de sentencia sumaria, a saber: (1) una exposición breve de las alegaciones de las partes; (2) los asuntos litigiosos o en controversia; (3) la causa de acción sobre la cual se solicita la sentencia sumaria; (4) una relación concisa, organizada y en párrafos enumerados de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen estos hechos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal; (5) las razones por las cuales se debe dictar la sentencia, argumentando el derecho aplicable, y (6) el remedio que debe ser concedido. 32 LPRA Ap. V, R. 36.3; *Pérez Vargas v. Office Depot,* 203 DPR 687 (2019). Si el promovente de la moción incumple con estos requisitos, "el

tribunal no estará obligado a considerar su pedido". *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 111 (2015).

Cabe destacar que, "la parte que desafía una solicitud de sentencia sumaria no puede descansar en las aseveraciones o negaciones consignadas en su alegación". *León Torres v. Rivera Lebrón,* supra, pág. 43. Por el contrario, la Regla 36.3(c) de las Reglas de Procedimiento Civil, 32 LPRA Ap. V, R. 36.3(c), obliga a quien se opone a que se declare con lugar esta solicitud a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente puesto que, si incumple, corre el riesgo de que se dicte sentencia sumaria en su contra, si la misma procede en derecho. *Íd.*

Por ello, en la oposición a una solicitud de sentencia sumaria, el promovido debe puntualizar aquellos hechos propuestos que pretende controvertir y, si así lo desea, someter hechos materiales adicionales que alega no están en disputa y que impiden que se dicte sentencia sumaria en su contra. *León Torres v. Rivera Lebrón,* supra. Claro está, para cada uno de estos supuestos, deberá hacer referencia a la prueba específica que sostiene su posición, según exigido por la antes citada Regla 36.3 de Procedimiento Civil. *Íd.* En otras palabras, la parte opositora tiene el peso de presentar evidencia sustancial que apoye los hechos materiales que alega están en disputa. *Íd.* De lo anterior se puede colegir que, ante el incumplimiento de las partes con las formalidades de la Regla 36 de Procedimiento Civil de 2009, *supra,* la consideración de sus posiciones descansa en la sana discreción del Tribunal.

Al atender la solicitud, el Tribunal deberá asumir como ciertos los hechos no controvertidos que se encuentren sustentados por los documentos presentados por el promovente. *E.L.A. v. Cole,* 164 DPR 608, 626 (2005). Toda inferencia razonable que pueda surgir de los hechos y de los documentos se debe interpretar en contra de quien

solicita la sentencia sumaria, pues sólo procede si bajo ningún supuesto de hechos prevalece el promovido. *Íd.*, pág. 625. Además, al evaluar los méritos de una solicitud de sentencia sumaria, el juzgador debe actuar guiado por la prudencia y ser consciente en todo momento que su determinación puede conllevar el que se prive a una de las partes de su "día en corte", componente integral del debido proceso de ley. *León Torres v. Rivera Lebrón,* supra*,* pág. 44.

Sin embargo, la sentencia sumaria generalmente no procederá cuando existan controversias sobre hechos esenciales materiales, o si la controversia del caso está basada en elementos subjetivos como intención, propósitos mentales, negligencia o credibilidad. *Segarra Rivera v. Int'l Shipping et al.*, 208 DPR 964 (2022). Además, existen casos que no se deben resolver mediante sentencia sumaria porque resulta difícil reunir la verdad de los hechos mediante declaraciones juradas o deposiciones. *Jusino et als. v. Walgreens*, 155 DPR 560, 579 (2001). De igual modo, no es apropiado resolver por la vía sumaria "casos complejos o casos que involucren cuestiones de interés público". *Íd.*

El Tribunal Supremo de Puerto Rico ha discutido los criterios que este Tribunal de Apelaciones debe considerar al momento de revisar una sentencia dictada sumariamente por el foro de instancia. *Roldán Flores v. M. Cuebas et al.*, 199 DPR 664, 679-680 (2018); *Meléndez González et al. v. M. Cuebas,* supra, págs. 118-119. Nuestro más Alto Foro señaló que:

> [E]l Tribunal de Apelaciones debe: (1) examinar de *novo* el expediente y aplicar los criterios que la Regla 36 de Procedimiento Civil, *supra,* y la jurisprudencia le exigen al foro primario; (2) revisar que tanto la Moción de Sentencia Sumaria como su oposición cumplan con los requisitos de forma codificados en la referida Regla 36; (3) revisar si en realidad existen hechos materiales en controversia y, de haberlos, cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V, de exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos, y (4) de encontrar que los hechos materiales realmente están incontrovertidos, debe

proceder a revisar *de novo* si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia. *Roldán Flores v. M. Cuebas et al.,* supra, pág. 679.

Conforme a lo anterior, los foros apelativos nos encontramos en la misma posición que el Tribunal de Primera Instancia y utilizamos los mismos criterios para evaluar la procedencia de una sentencia sumaria. *González Meléndez v. Municipio Autónomo de San Juan y otros,* supra. Por ello, nuestra revisión es una *de novo*, y nuestro análisis debe regirse por las disposiciones de la Regla 36 de Procedimiento Civil, *supra,* y su jurisprudencia interpretativa. *González Santiago v. Baxter Healthcare,* 202 DPR 281, 291 (2019). De esta manera, si entendemos que los hechos materiales realmente están incontrovertidos, debemos revisar *de novo* si el foro primario aplicó correctamente el derecho. *Acevedo Arocho y otros v. Departamento de Hacienda de Puerto Rico y otros,* supra.

### A. Ley Sobre Despido injustificado

La Ley 80, *supra,* se adoptó en protección del obrero que ha sido privado injustificadamente de su trabajo, sin la oportunidad de recibir una indemnización para suplir sus necesidades básicas. *Segarra Rivera v. Int'l Shipping et al.,* supra. A esos efectos, la Ley 80, *supra,* le impone al patrono el pago de una indemnización o mesada, a favor de aquel empleado que es despedido, sin justa causa. *Íd.*

Sobre lo que constituye justa causa para el despido, el Artículo 2 de la Ley Núm. 80, 29 LPRA sec. 185b, enumera varias circunstancias que afectan el buen y normal funcionamiento de una empresa, a saber:

> Se entenderá por justa causa para el despido de un establecimiento:
> (a) [...]
> (b) [...]
> (c) [...]
> (d) Cierre total, temporero o parcial de las operaciones del establecimiento. En aquellos casos en que el patrono posea más de una oficina, fábrica, sucursal o planta, el

cierre total, temporero o parcial de las operaciones de cualquiera de estos establecimientos donde labora el empleado despedido, constituirá justa causa para el despido a tenor con este Artículo.

(e) **Los cambios tecnológicos o de reorganización**, así como los de estilo, diseño o naturaleza del producto que se produce o maneja por el establecimiento y los cambios en los servicios rendidos al público.

(f) **Reducciones en empleo que se hacen necesarias debido a una reducción en el volumen de producción, ventas o ganancias, anticipadas o que prevalecen al ocurrir el despido o con el propósito de aumentar la competitividad o productividad del establecimiento**.

(Énfasis nuestro).

Sin embargo, esas seis instancias son sólo ejemplos de escenarios que pueden considerarse justa causa para el despido. *SLG Torres-Matundan v. Centro Patología,* 193 DPR 920, 930 (2015). La Ley 80, *supra,* no pretende ni puede considerar "la variedad de circunstancias y normas de los múltiples establecimientos de trabajo, ser un código de conducta que contenga una lista de faltas claramente definidas y la sanción que corresponda a cada una y en cada instancia." *Íd.* Por tanto, "los patronos están en libertad de adoptar los reglamentos y las normas razonables que estimen necesarias para el buen funcionamiento de la empresa y en las que se definan las faltas que, por su gravedad, podrían acarrear el despido como sanción. *Íd.*

Cónsono con lo anterior, un patrono puede modificar su forma de hacer negocios a través de algún tipo de cambio dirigido a incrementar las ganancias del negocio, ya sea eliminando plazas, creando otras nuevas o fusionando algunas ya existentes para así poder enfrentar problemas financieros o de competitividad, siempre que responda a una restructuración *bona fide. SLG Zapata-Rivera v. J.F. Montalvo*, 189 DPR 414 (2013).

En cualquier caso, en que se despidiesen empleados o empleadas por las razones indicadas en los incisos (d), (e) y (f) del Artículo 2 de la ley antes citada, el patrono estará obligado a retener con preferencia en el empleo a los empleados o empleadas de más

antigüedad. Respecto a lo antes el Artículo 3 de la Ley Núm. 80, 29 LPRA sec. 185c establece lo siguiente:

> En cualquier caso en que se despidiesen empleados o empleadas por las razones indicadas en los incisos (d), (e) y (f) de la sec. 185b de este título, el patrono estará obligado a retener con preferencia en el empleo a los empleados o empleadas de más antigüedad, siempre que subsistan puestos vacantes u ocupados por empleados o empleadas de menos antigüedad en el empleo dentro de su clasificación ocupacional que puedan ser desempeñados por ellos(as), entendiéndose que se dará preferencia a los empleados o empleadas despedidos(as) en caso de que dentro de los seis (6) meses siguientes a su cesantía tuviere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados o empleadas al momento de su despido y dentro de su clasificación ocupacional, siguiéndose también el orden de antigüedad en la reposición excepto, y en ambas situaciones, en aquellos casos en que haya una diferencia razonablemente clara o evidente en favor de la capacidad, competencia, productividad, desempeño , eficiencia o historial de los(as) empleados(as) comparados, en cuyo caso el patrono podrá seleccionar a base de dichos criterios. Disponiéndose, que:
>
> (a) En el caso de despidos o reducciones de personal por las razones contempladas en los incisos (d), (e) y (f) de la sec. 185b de este título en empresas que tienen varias oficinas, fábricas, sucursales o plantas, y en las que la práctica es que usual y regularmente los empleados o empleadas de una oficina, fábrica, sucursal o planta no se trasladan a otra, y que dichas unidades operan sustancialmente de forma independiente en cuanto a los aspectos de personal, la antigüedad de los empleados o empleadas dentro de la clasificación ocupacional objeto de la reducción de personal, se computará tomando en cuenta únicamente los empleados o empleadas en la oficina, fábrica, sucursal o planta en la cual se va a hacer dicha reducción de personal.
>
> (b) En el caso de empresas con varias oficinas, fábricas, sucursales o plantas en las cuales existe la práctica usual y regular de que sus empleados o empleadas se trasladan de una unidad a otra y que las distintas unidades operan de forma sustancialmente integrada en cuanto a los aspectos de personal, la antigüedad se computará a base de todos los empleados o empleadas de la empresa, o sea, tomando en consideración todas sus oficinas, fábricas, sucursales o plantas, que están en la clasificación ocupacional objeto de la reducción de personal.

El Tribunal Supremo ha establecido los factores a considerar al momento de surgir controversias con relación a clasificaciones ocupacionales en que se desempeña un empleado, a saber: (i) las funciones y los deberes del puesto; (ii) los requisitos para ocupar la plaza, incluyendo los conocimientos y las destrezas necesarias, así como la preparación académica; (iii) forma de compensación y (iv) forma en que se realiza el trabajo. *Díaz v. Wyndham Hotel Corp.*, 155 DPR 364, 371 (nota núm. 12).

De otra parte, antes de la aprobación de la Ley Núm. 4-2017, mejor conocida como Ley de Transformación y Flexibilidad Laboral, el Art 8 de la Ley 80, *supra*, 29 LPRA sec. 185k(a), disponía que "el patrono vendrá obligado a alegar, en su contestación a la demanda, los hechos que dieron origen al despido y probar que el mismo estuvo justificado".

Respecto a esa disposición, el Tribunal Supremo expresó en *Feliciano Martes v. Sheraton*, 182 DPR 368, 385 (2011), que lo anterior invertía el orden de la prueba en casos civiles y le imponía al patrono el debes de que el despido fue justificado. Posteriormente, en *Romero et als. v. Cabrer Roig et als*, 191 DPR 643, 652 (2014) dispuso lo siguiente:

> "Finalmente, para adelantar el propósito de su naturaleza reparadora, la Ley Núm. 80, *supra*, invierte el orden de la prueba en casos civiles y le impone al patrono el deber de probar *in limine* que el despido fue justificado. Si así lo prueba, el patrono no estará obligado a pagar la mesada. Véase *Secretario del Trabajo v. I.T.T.*, 108 DPR 536 (1979). Además, la Ley Núm. 80, *supra*, dispone que, en toda acción instada al amparo de esta, el patrono estará obligado a alegar en la contestación a la demanda, los hechos que dieron origen al despido y probar que estuvo justificado para quedar eximido del pago de la indemnización que dispone esa ley. 29 LPRA sec. 185k(a). En otras palabras, la Ley Núm. 80, *supra*, establece una excepción a la norma general de derecho que dispone que en toda reclamación judicial instada por una parte contra un demandando, sea el reclamante quien tiene la obligación de probar sus alegaciones para prevalecer en un pleito. (Citas omitidas)

No obstante, el Art 4.9 de la Ley de Transformación y Flexibilidad Laboral enmendó el Art. 8 de la Ley 80, *supra*, para eliminar el origen de la presunción. Cónsono con esto, recientemente, el Tribunal Supremo en *Ortiz Ortiz v. Medtronic* 209 DPR 759 (2022), aclaró sobre quien recae el peso de la prueba. En lo pertinente, dispuso lo siguiente:

> "Ahora bien, "**para disfrutar de la presunción generada por la Ley** [**Núm.**] **80 hace falta, como elemento de umbral, que haya habido un despido**". (Negrilla suplida). *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 907. Por tal razón, "[el] demandante tiene la obligación de aportar prueba que establezca los

hechos básicos que den lugar a la presunción". ́Id., pág. 911.

Una vez activada la presunción estatutaria a favor del empleado, el patrono tiene el deber de presentar prueba para rebatir la presunción y, además, persuadir al juzgador mediante preponderancia de la evidencia. *Rivera Figueroa v. The Fuller Brush Co.*, supra, pág. 911".

La ley aplicable a unos hechos es "la que estaba vigente cuando ocurrieron los hechos que dan lugar a la causa de acción. *Ortiz Ortiz v. Medtronic*, supra.

### B. Discrimen en el empleo

El discrimen es un trato desigual injustificado que una persona sufre por perjuicio o arbitrariedad, sin que exista un fundamento razonable para ello. *Meléndez v. Asociación Hospital del Maestro,* 156 DPR 828 (2002). Como se sabe, el Artículo II, Sec. 1 de la Constitución del Estado Libre Asociado de Puerto Rico promulga la igualdad de todos los hombres y mujeres ante la ley. Art. II, Sec. 1, Const. ELA, LPRA Tomo 1. Así, nuestra Ley Suprema expresamente prohíbe el discrimen por motivo de raza, color, sexo, nacimiento, entre otras. *Pérez Rodríguez v. López Rodríguez et al.,* 210 DPR 163 (2022).

Análogamente, la Ley Núm. 100, *supra,* prohíbe a un patrono despedir, limitar o discriminar a un empleado suyo por razón de edad, raza, color, sexo, entre otras. *Segarra Rivera v. Int'l Shipping et al.*, supra. A esos efectos, la Ley Núm. 100, *supra,* establece una causa de acción civil por daños a favor de aquella persona que fue despedida o se vio afectada en su empleo por razón de su edad, raza, color, religión, origen o condición social. *Íd.*

Para activar la presunción de discrimen (caso *prima facie*) el empleado demandante tiene que probar tres elementos: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; (3) presentar evidencia indicativa de la modalidad de discrimen que se vincula al despido. Es en ese momento que se

activa la presunción. En reclamaciones de discrimen por edad y atinente al recurso ante nos, el reclamante deberá establecer que pertenece a una clase protegida (por edad) que estaba cualificado, que fue despedido y que fue sustituido por una persona más joven. *Segarra Rivera v. Int'l Shipping et al.*, supra, a las págs. 987 -991*; Díaz v. Wyndham Hotel Corp.*, a las págs. 364, 384, 390 citando a *S.L.G. Hernández-Beltrán v. TOLIC,* 151 DPR 755 (2020). [Citas omitidas].

### III.

La apelante cuestiona la *Sentencia* apelada, por entender que, el foro *a quo* incidió al acoger la solicitud de sentencia sumaria presentada por ESJ y al desestimar la totalidad del pleito incoado en su contra, decretando que quedó demostrado que el despido fue motivado por una reorganización y/o reestructuración *bona fide* realizada para optimizar los recursos del hotel. En particular, arguyó que, el foro primario erró al no determinar que hubo discrimen y que la parte apelada no cumplió ni siguió el orden de antigüedad para la retención de su empleo dentro de la clasificación ocupacional por las funciones que ejercía siendo la empleada con mayor cantidad de años de servicio. Asegura que, el TPI no consideró que aún persistan controversias medulares que impiden la adjudicación de la causa por la vía sumaria.

Como anteriormente expresamos, en virtud de la normativa antes expuesta, esta Curia debe revisar *de novo* la *Moción de Sentencia Sumaria* presentada por ESJ y la *Réplica a Moción de Sentencia Sumaria* presentada por Wilkerson-Tilley y escritos posteriores con sus respectivos anejos, a la luz del derecho aplicable, para así evaluar la determinación del foro primario. Nos corresponde evaluar si ambas partes cumplieron los requisitos de forma que exige la Regla 36, *supra,* si existen hechos materiales en

controversia que impiden la adjudicación del caso sumariamente, para luego aplicar y analizar el derecho correspondiente.

Destacamos que, los tribunales apelativos estamos en igual posición que el foro sentenciador al revisar un petitorio sumario. Según la norma aplicable, quien se opone a que se declare con lugar una solicitud de sentencia sumaria viene obligado a enfrentar la moción de su adversario de forma tan detallada y específica como lo ha hecho el promovente. Así, en su oposición, el promovido debe puntualizar aquellos hechos propuestos que pretende controvertir y hacer referencia a la prueba específica que sostiene su posición, según exigido por la Regla 36.3 de Procedimiento Civil, *supra*.

Luego de examinar cuidadosamente la moción de sentencia sumaria y la oposición, somos de la opinión que ambas partes cumplieron sustancialmente con las exigencias y formalidades requeridas por la Regla 36, *supra*. Ambas partes incluyeron una relación concisa y enumerada de los hechos esenciales sobre los cuales alegan no existían controversias sustanciales y establecieron la relación entre los hechos propuestos, con los documentos sometidos, en apoyo a los mismos.

Superado lo anterior, procede atender las demás controversias presentadas ante nuestra consideración, las cuales coinciden con el examen *de novo* que nos corresponde realizar sobre una solicitud de sentencia sumaria.

Al examinar el petitorio sumario de ESJ y la *Oposición a la Moción de Sentencia Sumaria,* notamos que la apelante admitió 13 de los 54 hechos propuestos por ESJ.[9] De nuestro análisis de las 41 objeciones presentadas por Wilkerson-Tilley, entendemos que el foro primario reconoció que no logró establecer la causa de acción sobre discrimen al amparo de la Ley 100 y derrotar los hechos propuestos sobre la presentación de un plan *bona fide* de reorganización de la

---

[9] Véase, Apéndice págs. 478-480, *Oposición a Moción de Sentencia Sumaria.*

empresa, los cuales se encuentran sostenidos con la prueba documental presentada por ESJ. Ahora bien, en lo atinente al tema sobre la clasificación y las funciones de los puestos en controversia, así como el criterio de la antigüedad, las determinaciones consignadas por el TPI nos resultan insuficientes para sostener la desestimación de la totalidad de la presente causa por la vía sumaria en esta etapa de los procedimientos. Nos explicamos.

En apretada síntesis, surge de los hechos incontrovertidos que en el año 2015 un grupo de inversionistas, que incluía al Sr. Andro Nodarse (Sr. Nodarse), adquirió el Hotel San Juan y que decidieron hacer una renovación millonaria a la estructura. Wilkerson-Tilley comenzó a laborar en ESJ en el 1989. Desde el 2016 hasta el 2017, el Hotel San Juan estuvo cerrado por la referida renovación, en la cual se demolieron habitaciones, se restableció la fachada y las áreas de entretenimiento. Luego del paso de los huracanes Irma y María en el 2017, el hotel tuvo un déficit operacional para el 2017 de $47,419,745.00[10], para el 2018 de $39,753,679.00[11] y para el 2019 de $18,750,683.00[12]. Como consecuencia de lo anterior, ESJ comenzó a evaluar su viabilidad empresarial, considerando una reestructuración por problemas en el mercado, económicos y por los retos administrativos. El Sr. Nodarse, uno de los dueños del hotel, formó parte del equipo, junto a la compañía Coral Tree, para evaluar la situación económica por la cual pasaba el hotel en ese momento.

La prueba incontrovertida establece que la empresa emitió un plan de reestructuración y ahorro que incluía la eliminación de varios puestos de trabajo, entre ellos, el de Wilkerson-Tilley, quien

---

[10] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 6, del expediente digital del Caso Núm. CA2021CV00671 en el Sistema Unificado de Manejo y Administración de Casos (SUMAC).

[11] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 7, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.

[12] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 8, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.

tenía el puesto de *Front Office Manager,* el cual era uno de supervisión intermedio.[13] Como parte de los documentos anejados, surge el "Forecast Changes", el "Contingency Plan-Reorganization 2019" y el "San Juan Focus Template". El documento intitulado "Forecast Changes" proyecta un déficit operacional de -$8,152,715.00 para el 2019.[14] Por otro lado, el documento intitulado "San Juan Focus Template" contemplaba ahorros en varias áreas, entre ellas: ahorros en bebidas, aumento en precios de comidas, cambio de horarios de operaciones de barra principal, ahorros en electricidad, entre otros. Asimismo, el documento intitulado "Contingency Plan-Reorganization 2019" contempla la eliminación de varias plazas, en las que se encontraba la posición de *Front Office Manager,* la cual pertenecía a Wilkerson-Tilley.[15] Los ahorros proyectados en salarios por el plan de reestructuración se estimaron en $900,879.60.[16]

ESJ demostró mediante declaraciones juradas, deposiciones y documentos relacionados al "Plan de Reestructuración" que la restructuración fue *bona fide*, y que se realizó como consecuencia al millonario déficit financiero por el cual pasó el hotel desde el 2017 al 2019. ESJ demostró en los correos electrónicos presentados del 18 de julio de 2019[17], que se estaba considerando un plan de reorganización el cual incluía recortes en puestos de trabajo, ahorro de gastos y generación de ingresos, entre otras consideraciones. Junto al correo electrónico, se adjuntó un desglose de diferentes partidas en las cuales se determinaba una a una los gastos a eliminarse, reducirse o aumentarse. Entre ellos, gastos de

---

[13] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 9, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.
[14] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 11, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.
[15] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 12, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.
[16] *Íd.*
[17] Véase, la entrada Núm. 41 (*Moción de Sentencia Sumaria*), Anejo 10, del expediente digital del Caso Núm. CA2021CV00671 en el SUMAC.

habitaciones, F&B GOP Flow Improvements (en el cual incluía "*Staffing Contingency Plan – Holds and Eliminations*"), Ventas y Mercadeo, Ingeniería, entre otros.[18]   A su vez, se presentó los documentos intitulados como *Forecast Changes*, *San Juan Focus Templates* y el *Contingency Plan*, junto a los estados financieros de los años 2017-2019, los cuales sustentan las deficiencias económicas por las cuales pasaba el hotel en ese momento. Particularmente, el "Contingency Plan" disponía que de las posiciones que serían eliminadas, se encontraba la de *Front Office Manager*, posición de Wilkerson-Tilley.

De los correos electrónicos que obran en el expediente, resaltamos lo siguiente:

> Gents,
> Please see the progress being made on the plan including some reductions in workforce, expense savings and some revenue generation. Martin has also sought legal review of severance which I pasted below as well. I would like to suggest we use tomorrow´s call time to review this plan.  If so, I would like to invite Martine and Michael to join us.
> Please let me know your thoughts; the goal for tomorrow is to get your approval to proceed with the full plan (some has already been incorporated and initiated) Pls be sure to scroll down further on the email for more detail on the plan.
> Thanks

[…]

> F&B GOP Flow Improvement of $204k
> 1. Reduced staffing in all outlets, kitchen, and stewarding – 500 hours per week - $166k
> 2. Staffing contingency plan (holds and eliminations) - $223k

[…]

De lo antes y de nuestro análisis minucioso del expediente, concluimos que el TPI acertó correctamente que los apelados lograron demostrar que le empresa realizó una reorganización *bona fide*. Según la normativa antes expuesta, nuestro más Alto Foro ha determinado que basta con que el patrono acredite al Tribunal que

---

[18] *Íd.*

la reorganización o reestructuración empresarial responde a una decisión gerencial válida y no a un mero capricho o arbitrariedad por parte del patrono. Esto, pues el patrono tiene derecho a hacer los arreglos o cambios que estime necesarios y convenientes para optimizar sus recursos y aumentar las ganancias de la empresa.[19] El TPI no incidió en sus determinaciones sobre el plan de reorganización *bona fide*.

No obstante, lo anterior, debemos puntualizar que el análisis no concluye ahí. Conforme la normativa antes reseñada, y en particular lo resuelto en *SLG Zapata-Rivera v. J.F. Montalvo*, supra a las págs. 427-428 y *Díaz v. Wyndham Hotel, Corp.*, supra, una vez el patrono determina mediante una restructuración *bona fide*, modificar su forma de hacer negocios a través de un cambio dirigido a incrementar ganancias del negocio ya sea eliminando plazas, creando otras o fusionando las existentes, procede determinar si cumplió con la retención de empleados de mayor antigüedad en una clasificación ocupacional. Por disposición estatutaria, en cualquier caso, que se despidan empleados por esta razón el patrono estará obligado a retener con preferencia en el empleo a los empleados de más antigüedad siempre que subsistan puestos vacantes u ocupados por empleados de menos antigüedad en el empleo dentro de su clasificación ocupacional. Se dará preferencia a los empleados despedidos en caso de que dentro de los seis meses siguientes a su cesantía tuviere necesidad de emplear a una persona en labores iguales o similares a las que desempeñaban dichos empleados al momento de su despido dentro de su clasificación siguiéndose el orden de antigüedad en la reposición. Lo antes, con excepción si existe una diferencia razonablemente clara o evidente, en favor de la capacidad, competencia, productividad, desempeño, eficiencia o

---

[19] *Segarra Rivera v. Int'l Shipping Agency*, supra.

historial de empleados comparados, en cuyo caso el patrono podrá seleccionar a base de dichos criterios.

De una revisión sosegada de las determinaciones de hecho consignadas por el foro primario es de notar que, el TPI no consignó ni incluyó en su dictamen, hechos que atiendan de forma fehaciente esta disposición estatutaria. El TPI se limitó a establecer las determinaciones conclusorias sobre este tema sin mayor discusión y análisis sobre los criterios que se deben examinar previo a concluir que el patrono cumplió lo establecido en el Art. 3 de la Ley 80, *supra*. De una lectura de la moción de sentencia sumaria no surge una lista de funciones del puesto eliminado, las funciones de los puestos que se mantuvieron o creadas, las fechas de la creación de puestos con funciones similares, antes y después, entre otros datos.[20] A modo de ejemplo, surge de la oposición del petitorio sumario que la apelante objetó por entender que no se presentó "ni siquiera" una descripción de funciones y deberes y que las funciones de su puesto no fueron delegadas a su supervisor sino a otra empleada en un puesto creado durante el periodo de la presunta reorganización de la empresa. [21]

Al interpelar sobre la insuficiencia de lo antes, la apelante aduce que, aunque el nombre del puesto de la Sra. Ramos es distinto en título al puesto que ésta ostentaba, los deberes y funciones de ambos puestos coincidían. Wilkerson-Tilley alega que aún existen hechos en controversia sobre cómo, fue que ESJ creó un puesto de *Guest Relations Manager*, el cual fue asignado a la Sra. Ramos, quien tenía el puesto de *Concierge Manager* y se reportaba a ésta

---

[20] A modo de ejemplo, cabe señalar los siguientes: [...] 43. Yvonne Ramos fue nombrada en febrero de 2019 como Director of Guest Relations. 44. El Director of Guest Relations se encarga de ser un punto de contacto con problema de los huéspedes recurrentes. Este puesto es una posición junior, con salario inferior, responsabilidades distintas, no de supervisión. Esta posición se reportaba directamente al Director of Rooms. 45. Susan Wilkerson no se encontraba en la misma clasificación ocupacional, ni tenía las mismas funciones y forma de hacer el trabajo que Yvonne Ramos.[...] Apéndice, pág. 111.
[21] Apéndice pág. 475-476.

con funciones similares. Añadió que las funciones que esta ejercía en su puesto fueron asignadas mediante el nuevo puesto a la Sra. Ramos. Arguyó que, los documentos presentados por ESJ para sustentar sus hechos propuestos debían ser considerados como prueba de referencia al ser documentos no oficiales, lo cuales nadie autenticó y de los cuales no se podía determinar cuál era la información correcta. Además, sostiene que mediante los testimonios del Sr. Nogarse y la Sra. Olmo Díaz, la parte demandada no ofreció prueba documental admisible para sustentar y corroborar las opiniones expuestas sobre las clasificaciones y funciones de los puestos eliminados y creados antes y después del despido que presuntamente coincidieron con el periodo de la reorganización de la empresa.

Para sustentar su posición, la apelante ofreció una tabla de funciones, así como la descripción de los puestos creados con posterioridad a su despido. A tales efectos, la apelante expuso que a tenor con la Ley 80, *supra*, ESJ debió haberla escogido bajo el criterio de antigüedad, siempre y cuando tuvieran la misma clasificación ocupacional, independientemente de que tuviesen títulos distintos. Citó al tratadista Alberto Acevedo Colom, quien explicó que diversas plazas dentro de una empresa constituyen una misma clasificación ocupacional cuando éstas conllevan deberes y funciones similares. Al agrupar ciertos puestos dentro de una clasificación ocupacional -en cumplimiento con la Ley 80, *supra,* -lo esencial es considerar la similitud entre las funciones, deberes y requisitos de los distintos puestos. No así el título del puesto ni la remuneración que se le haya asignado. Alberto Acevedo Colom, *Legislación Protectora del Trabajo Comentada*, 7ma Ed. Rev., San Juan, Ramallo Printing Bros., 2001, págs. 154- 160.

Por su parte, ESJ en su réplica al petitorio sumario planteó que la demandante no controvirtió propiamente los hechos sobre

esta particular. De igual forma mediante su *Oposición a Apelación* expuso que, la alegación de la Sra. Wilkerson-Tilley sobre los tres puestos creados posteriormente para sustituir el de ella, es falsa. Aducen que el puesto de *Guest Relations Manager*, perteneciente a la Sra. Ramos, fue creado meses antes de la reorganización que dio lugar a su despido. Finalmente, alegan que el puesto de *Night Manager* fue creado 8 meses luego de la eliminación de la plaza de Wilkerson-Tilley y que el puesto de *Guest Relations Manager* se creó para febrero del 2020.

Es de notar que ninguno de los supuestos presentados por ambas partes sobre este tema fue atendido propiamente por el TPI en sus determinaciones de hechos. En ausencia de determinaciones de hecho sobre lo antes reseñado colegimos que persisten asuntos medulares en controversia.

De un examen del dictamen recurrido nos resulta evidente que el TPI no consignó las determinaciones de hechos[22] necesarias para concluir que en este caso se cumplió las exigencias del proceso de retención y antigüedad. El TPI incluyó una conclusión en su hecho número 44 que expone que el puesto de Wilkerson-Tilley y el de la Sra. Ramos no estaban en la misma clasificación ocupacional ni tenían las mismas funciones o forma de trabajar. Sin embargo, el TPI no identificó las funciones de cada cual. Como se sabe, el Tribunal Supremo ha establecido que para efectuar un análisis para determinar qué empleados pertenecen a la misma clasificación ocupacional para el análisis de antigüedad requerido por el artículo 3 de la Ley 80, *supra,* el foro primario deberá establecer las funciones y deberes del puesto, los requisitos para ocupar la plaza, incluyendo conocimientos y destrezas, compensación y forma en

---

[22] Véase, Apéndice pág. 10. En particular, la determinación de Hecho Núm. 44 de la *Sentencia* emitida por el TPI.

que se realiza el trabajo. Veáse en particular *Díaz v. Wyndham Hotel Corp., supra.*

Aun cuando ESJ presentó porciones del plan de reorganización, éste no presentó algún documento o información fehaciente que determinara o estableciera la clasificación de los puestos en controversia, ni antes de la reorganización o después. Descansó en las expresiones del Sr. Nodarse y la Sra. Olmo. Sin embargo, a pesar de ello, el foro primario no consignó como hechos las funciones de cada puesto en ocntroversia, y mucho menos identificó en sus hechos cuál era el plan de clasificación en el cual se establecieran los puestos y sus respectivas responsabilidades, a los efectos de poder determinar si en este caso se cumplió la retención de empleos conforme la antigüedad de los empleados.

Ante el silencio del TPI en sus determinaciones de hechos sobre el cumplimiento de lo dispuesto en el artículo 3, *supra,* concluimos que subsisten controversias medulares que impiden la adjudicación en parte de la causa sobre despido injustificado por la vía sumaria. Es por ello que, determinamos que el foro primario deberá atender las siguientes controversias medulares, a saber: las funciones de los puestos, las fechas de su creación, cuáles son las similitudes, cuáles son sus diferencias, cuáles funciones fueron absorbidos por el supervisor, cuáles fueron repartidos a puestos antes y después del despido de la demandante, así como los años de servicio para establecer antigüedad. Una vez el foro primario atienda estas controversias medulares e identifiqué los hechos fehacientes en cumplimiento de la normativa antes expuesta, estará en posición para concluir si la empresa cumplió las exigencias de nuestro derecho laboral.  En vista de lo antes colegimos que el segundo error se cometió.

Superado lo anterior, nos corresponde atender la controversia respecto a las alegaciones de la apelante referente a su señalamiento sobre discrimen por edad e incapacidad. Veamos.

Wilkerson-Tilley alega que fue víctima de conductas hostiles y discriminatorias por razón de su edad, las cuales crearon un ambiente de trabajo hostil hacia su persona. En lo pertinente, manifestó que estas fueron realizadas por el gerente general y el subgerente del hotel y por los directores del *Room Division* del hotel, entre otras personas. Asimismo, arguyó que el Sr. Smith le expresó "*Vive en el futuro, no en el pasado*" y "*vas a ver muchos cambios, y tenemos que mantenernos encaminados hacia la nueva era del Hotel*", lo cual considera hizo alusión a su edad.

Sobre este particular, surge del expediente y de la deposición de Wilkerson-Tilley lo siguiente:[23]

P    Una pregunta, ¿Qué edad más o menos tenía Mr. Smith?
R    No sé decirle. Yo sé que él tenía una hija en, en la misma escuela que estaban estudiando mis hijos, en sexto grado. "So"…
P    ¿Era mayor de cincuenta años?
R    Yo diría que sí.
P    Que por lo menos parecía. ¿Y Osorio?
R    Era recién casado. Yo diría que, que tenía que tener sus cincuenta también.
P    ¿Yvonne?
R    ¿Ramos? Ella se llevaba de, de, no, de nosotros como diez años.
P    "Which means"?
R    Yo tenía 57, ella tendría 47.
P    Okey. ¿Alguna vez usted presentó una querella en algún lugar por estas, ambientes hostiles y hostigamiento que usted me está contando aquí?
R    Con la señora Kerania.
P    ¿Cuándo?
R    El día 7 de junio.
P    Esa conversación que usted dice que tuvo, digo, que está el relato que estuvo en Caña, que es su manera o fue su presentación de la querella, ¿correcto?
R    No. Una queja, no una querella.

[…][24]

P    Tiene que permitir que yo pregunte. Que las manifestaciones no eran porque se estaba negociando un Convenio Colectivo, era porque Andro Nodarse, según usted, despidió gente mayor para contratar gente menor, ¿eso es así? ¿Eso es su testimonio?
R    Si me dejas terminar.

---

[23] Véase Apéndice, Deposición Susan Wilkerson-Tilley, págs. 222-223.
[24] Véase Apéndice, Deposición Susan Wilkerson-Tilley, pág. 226.

P        No. Mire la pregunta y me contesta.

R        No. Entonces no.

P        Pues, no. ¿La contestación es "no"? Okey. Gracias. Le pregunto, fuera de esas "sit downs", sentadas que tuvo conversación con Kerania, desde Boyd hasta el 2019, usted no le dijo a ningún personal gerencial, "Yo me siento discriminada por edad", ¿correcto?

R        No.

[…][25]

P        Okey. ¿Alguna vez, que usted recuerde, le mencionó a usted la palabra "edad", "vieja"?

R        No.

P        No. ¿Cuándo pasó eso que la "cortó", usted fue y puso una querella donde Kerania?

R        Ella estaba.

P        La, pero la pregunta fue si usted fue…

R        No.

P        …e hizo una querella donde Kerania. Me…

R        Fui a donde mi jefe, Osorio.

P        ¿Y qué le dijo a Osorio?

R        Yo le dije, "Osorio, usted me aprobó esto, ¿Por qué me paró en medio de mi presentación?" …

P        Ajá.

R        … y dijo, "No te preocupes, 'don't worry' ".

[…][26]

P        No. Okey. Yo estoy saltando un montón de alegaciones porque quiero estar bien claro que usted, fuera de la conversación de Caña con Kerania, usted no reportó ningún incidente de discrimen por edad ni de hostigamiento, ¿correcto?

R        Es correcto.

De otra parte, surge de la deposición de Wilkerson-Tilley, relacionado al alegado discrimen por incapacidad lo siguiente:[27]

P        ¿Y se recuerda cual es el diagnóstico? ¿Cómo le llamó a la fractura? ¿Cómo se llamaba ese hueso?

R        Está escrito en los papeles de él, pero no los, no los tengo, no.

P        Ah, pues, voy a solicitarle a los compañeros que nos den copia de ese récord médico, por favor, para estar seguro de cómo, cómo es que los…

R        Hay términos médicos…

P        Sí, me imagino.

R        …que dicen exacto dónde es y, y cuestiones así.

P        ¿Y entonces mencionó tres meses, "so", si esto ocurrió en octubre y usted fue en enero, estamos hablando de marzo? ¿En marzo más o menos le dicen, "Tu tienes una fractura"? ¿Si?

R        Sí. Y entonces, el, la forma de explicó (sic), "o lo dejas, para su edad, puede ser que empieces a tener artritis…

P        Unjú.

R        …por esa fractura "o" "yo puedo entrar y hacerte una cirugía y tratar de arreglar un tipo de músculo o algo, pero la fractura eventualmente se va a, a, a…", ¿"how do you say it? Like go back in, in" en el hueso.

P        Unjú.

---

[25] Véase Apéndice, Deposición Susan Wilkerson-Tilley, pág. 229.

[26] Véase Apéndice, Deposición Susan Wilkerson-Tilley, pág. 234.

[27] Véase Apéndice, Deposición Susan Wilkerson-Tilley, págs. 243-244.

R       Pero lo que me estaba afectado eran los músculos alrededor. Y yo todavía no podía, hacer así, no podía virar mí, mi brazo. Guiando fue un problema. "So", decidí, "Pues, vamos a entrar en la operación", me dio fechas, como estábamos en los "senior proms", yo dije, "Pues, déjame dejarlo para agosto que es el mes más lento"...

[…][28]

P       ¿Pero usted se reportó al Seguro Social con, "¿Mira, tengo esta incapacidad"?
R       No.
P       ¿No? Y la veo que está apoyada de los dos hombros y de hecho, casi toda la deposición ha utilizado los codos sobre la mesa.
R       Si.
P       ¿Eso es algo que le ha afectado a usted y usted dice, "Yo soy una incapacitada por, ¿por este incidente físicamente"?
R       No.
P       ¿No?
R       No.
P       ¿Ni en ese momento?
R       No. "Incapacitada", tengo molestias todavía.
P       Okey. Y... Explíqueme, si es que hubo una conversación con Kerania, qué usted le dijo a Kerania y qué Kerania le dijo a usted en relación a, a la operación.
R       Cuando yo decidí la fecha para mi cirugía, le dije a mi supervisor, que era Osorio, que me iba a operar. Que el tiempo estimado de recuperación iba a ser de treinta a sesenta días, que yo, para que él supiera que yo iba a estar fuera por enfermedad y seis meses, hasta seis meses de, de "rehab". Él me, él me dijo, "Cuando cojas tu, tu enfermedad, cógelo en vacaciones", yo le dije, "Pero yo tengo bastante tiempo acumulado de enfermedad". Yo sé que si coges vacaciones vas al 'payroll'. Sí.

[…][29]

R       Osorio me dijo a mí sí...
P       ..."cógete las, cógete las vacaciones...
R       "Cógelo del tiempo de vacaciones en vez de enfermedad para poder bajar el "payroll".
P       ¿Y no... ¿Entonces no fue...
R       Y yo le dije, "Pero...
P       ¿Pero a usted le pagan las vacaciones, verdad?
R       Si.
P       Okey.

En aras de sustentar su posición, la apelante presentó porciones de su deposición y la de la Sra. Olmo a los efectos de probar que fue víctima de discrimen por su edad y por incapacidad. De un análisis sosegado de los escritos y documentos presentados por Wilkerson-Tilley, colegimos que la apelante no demostró los

---

[28] Véase Apéndice, Deposición Susan Wilkerson-Tilley, págs. 246-247.
[29] Véase Apéndice, Deposición Susan Wilkerson-Tilley, pág. 248.

elementos fundamentales para sostener su causa de acción por discrimen por edad e incapacidad, respectivamente. Tampoco la apelante nos ha puesto en posición para determinar que el foro primario haya incidido en su análisis sobre la postura de la parte apelada sobre la improcedencia de esta causa de acción. El TPI correctamente determinó que la apelante no logró demostrar que fue discriminada por su edad o por alguna incapacidad conforme exige la normativa antes expuesta.

En virtud de lo anterior y de la facultad que nos confirió el Tribunal Supremo en *Meléndez González et. al. v. M. Cuebas*, supra, reconocemos que el TPI actuó correctamente al desestimar la causa de acción sobre discrimen por edad e incapacidad por la vía sumaria. De igual forma, el foro primario no incidió al determinar que en este caso se estableció un plan de reorganización *bona fide*. Sin embargo, por entender que subsisten controversias medulares sobre si en la presente causa se cumplió el proceso de retención de empleados por antigüedad y clasificación ocupacional, revocamos en parte el dictamen recurrido.

**IV.**

Por los fundamentos antes expuestos, confirmamos en parte y revocamos en parte la *Sentencia* apelada. En su consecuencia devolvemos el caso ante el foro primario para la continuación de los procesos conforme lo aquí resuelto.

Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones